UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
3801 BEACH CHANNEL INC., et al.                    DOCKET NO.: 05 CV 207
                             Plaintiffs,                             (CBA)

       -against-

YAKOV SHVARTZMAN, et al.,
                             Defendants.

-----------------------------------------------------------------X


# PLAINTIFFS' POST-HEARING MEMORANDUM

**BY: Val Kleyman, Esq.**
**KLEYMAN & ASSOCIATES, P.C.**
**2227 86th Street**
**Brooklyn, NY 11214**
**Attorney for the Plaintiffs**

# Table of Contents

Brief Statement of Fact and Procedural History………………………………..3

Discussion

        Compensatory Damages…………………………………………………..5

        Pre-Judgment Interest……………………………………………………..9

        Punitive Damages…………………………………………………………10

        Attorney's Fees…………………………………………………….....15

Summary……………………………………………………………………..18

**BRIEF STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Plaintiffs brought an action stemming from a sale of a gas station business to the Plaintiffs against all of the Defendants as stated in the Complaint. The case was originally brought by late Mr. Marvin Kramer on the behalf of all Plaintiffs. I took over this matter as attorney for all Plaintiffs on November 6, 2006. From the inception of this matter and as clearly evidenced by the applicable correspondence in the record, Defendants willfully and deliberately blocked Plaintiffs' access to discovery, disclosure and information that was necessary in order to proceed with this matter to trial. Defendants and their attorney not only chose to stonewall the discovery process disallowing Plaintiffs access to information critical for the progression of this matter, but also acted in blatant disregard and willfully disobeyed multiple Orders of this Court. Subsequently, the Court ordered Defendants answer stricken in its entirety and proceeded to sanction Defendants' attorney, Mr. Stephen Pergolizzi together with the Defendants for any and all costs associated with Plaintiffs laborious efforts to secure compliance with prior Court orders. The record clearly reflects all such efforts by the Plaintiffs. The Court also dismissed Plaintiffs' First Cause of action for RICO, and chose to exercise its jurisdiction over the remaining state law claims. Defendants and their attorney filed an appeal, which was opposed by Plaintiffs for being frivolous. On April 4, 2008, the Court of Appeals affirmed Plaintiffs position and dismissed the appeal for being frivolous. The Court of Appeals further ordered sanctions against Mr. Pergolizzi associated with filing of a frivolous appeal. On June 5, 2008, the Court granted Mr. Pergolizzi's motion to withdraw as counsel yet allowing him to appear during the inquest on any portion of the hearing concerning sanctions against him. During the damages inquest held on

September 17, Plaintiffs and Mr. Pergolizzi reached a settlement agreement whereas Mr. Pergolizzi agreed to compensate Plaintiffs in the amount of $5,000.00 on or before October 17, 2008, in full and final satisfaction of all sanctions related to Mr. Pergolizzi. The inquest into damages was held in several parts with Defendants, Yakov Shvartzman and Alexander Herman appearing pro-se.

During the damages inquest, Plaintiffs presented two witnesses: Yefim Yezerskiy and Yevgeniy Yezerskiy. Yefim Yezerskiy testified that he is the father of the Plaintiff, Yemeni Yezerskiy, and that he had personal knowledge and was present during the events that took place in connection with the purchase of the gas station business by his son. Plaintiffs presented the following exhibits admitted into evidence, copies of which are attached to this Memorandum as Exhibit "A":

**Exhibit "3"** – Checks from Yevgeniy Yezerskiy to Yevgeniy Tsynguaz (Total: $1,500.00)

**Exhibit "4"** – Check from Yevgeniy Yezerskiy to Yakov Shvartzman (Total: $2,000.00)

**Exhibit "5"** – Check from Yevgeniy Yezerskiy to Lighthouse Land Services (Total: $300.00)

Exhibit "6" – Check from Yevgeniy Yezerskiy to Yakov Shvartzman (Total: $57,000.00)

**Exhibit "7"** – Check from Yevgeniy Yezerskiy to Department of Finance (Total: $172.50)

**Exhibit "8"** - Check from Yevgeniy Yezerskiy to Alexander Herman (Total: $23,000.00)

**Exhibit "9"** – Paid bill from Intercontinental Investigations (Total $4,345.00)

**Exhibit "10"** – Statement from Washington Mutual Bank (Plaintiffs account)

**Exhibit "11"** – Statements from NorthEast Community Bank (Plaintiffs account)

**Exhibit "12"** - Check from Yevgeniy Yezerskiy to Marvin Kramer (Total: $2,000.00)

**Exhibit "13"** – Bill from Kleyman & Associates, P.C. (Plaintiffs' attorney fees)

**Exhibit "14"** – Check from Beach Channel Services, Inc. to Sunoco (Total: $10,000.00

**Exhibit "15"** – Written statement of amounts paid signed by Y. Shvartzman

## DISCUSSION

## COMPENSATORY DAMAGES

At the damages inquest, Plaintiff introduced into evidence various original checks made out to Defendants Alexander Herman and Yakov Shvartzman, (Plaintiffs' Exhibit "4", "6", and "8") totaling $82,000.00. These payments were made towards the purchase price for the gas station business. Both witnesses testified to the facts that these checks were given to the Defendants and subsequently cashed by them as evidenced clearly by the endorsements on the back of these checks and further by the bank statements showing the withdrawal of these funds from Plaintiff's bank account as shown in the Plaintiff's bank statements. (Plaintiff's Exhibit "10" and "11")

In addition to the checks given to the Defendants, both witnesses testified to the cash transactions that took place during which Plaintiffs gave another $54,385.00 in cash to the Defendants and third parties in furtherance of directives given by the Defendants'

5

to the Plaintiffs and in connection with operation of the gas station business. Plaintiffs witnesses testified that these were broken down into 5 different payments: $20,000.00 during closing towards the reimbursement of funds held by the land lord, $8,000.00 during the closing towards the purchase price, $10,000.00 at the closing for the gas that remained in the tanks, $6,385.00 as payment for a fuel delivery on the behalf of Yakov Shvartzman, and $10,000.00 deposited into the account of Defendant Corporation, Beach Channel Services, Inc to be paid to Sunoco Inc. for the gas fuel delivery. Plaintiff's Exhibit 14, is a check written from Defendant Corporation, Beach Channel Services Inc. to the order of Sunoco Company in the amount, of $10,000.00 that further evidences this transaction.

Plaintiffs introduced checks (<u>Plaintiffs Exhibit "3' and "12"</u>) that were paid to Plaintiffs' previous attorneys, Mr. Yevgeniy Tsyngauz, the attorney during the purchase transaction, and Mr. Marvin Kramer, the initial attorney responsible for bringing forth this action. The checks show that Plaintiffs paid $1,500.00 to Mr. Tsyngauz and $2,000.00 to Mr. Kramer.

Additionally, payment was made by check in the amount of $300.00 to Light House Services, which Plaintiffs witness testified to be for research of debt held against Defendants Corporation at the time of purchase. Another payment was made to the Department of Finance in the amount of $172.50 (<u>Plaintiffs Exhibit "7"),</u> which Plaintiffs witness testified to be in connection with the outstanding taxes of the Defendants' corporation at the time of the purchase transaction.

In addition to these checks, a statement was introduced from Intercontinental Investigations, which Mr. Yefim Yezerskiy testified to be a bill that was fully paid by the

Plaintiffs in the amount of $4,345.00 from the private investigator retained by the Plaintiffs in order to investigate the gas station and Defendants upon the initiation of litigation.

During the course of the inquest, Plaintiffs presented testimony of two witnesses that testified that they personally observed or are aware of each and every financial transaction as described. The witnesses further testified that all of the checks were deposited and the corresponding amount was withdrawn from their bank account.

Defendants did not present any testimony or evidence to refute that the checks were accepted, drawn and deposited. No testimony or evidence was also presented to contest that any and all of the cash transactions attested to by the Plaintiffs' witnesses occurred exactly as stated. Defendant relies solely on various documents that were allegedly executed by the Plaintiffs at closing. The only purpose of introduction of these documents was to attempt to mislead and confuse this Court.

Many of such documents introduced into evidence, specifically Defendants' Exhibit "O", "X" and "L", are written in part or entirely in Russian language, and no certified translation of the same was provided. As the content of such documents can not be accurately ascertained, these documents must be disregarded completely. The documents introduced as Defendants Exhibit "E", "F", "H", "J", and "K" are the documents that were allegedly executed by the parties at closing. These documents must be closely scrutinized as these were not the original documents that were executed by Plaintiffs at closing. In fact, Plaintiffs' witnesses both testified that there were multiple occasions during which closing documents were executed. They also testified that more than one set of closing documents was executed.

None of the evidence presented by the Defendants even remotely refutes or addresses Plaintiffs evidence as to the damages sustained. Plaintiffs presented clear evidence of checks and cash expanded during the purchase transaction and the short time that followed. Defendants' evidence and testimony of Yakov Shvartzman presented does not address any of these checks or cash transactions. The alleged closing documents do not address the issue of damages sustained, but only the possible terms of the transaction at the time of purchase, which are not in dispute as Defendants were already found liable for fraud and any such documents are tainted by the fraud they were used to perpetrate.

Further, the only testimony that was heard to support Defendants' position was from the Defendant, Yakov Shvartzman. This testimony, yet again, did not address any of the damages and evidence thereof presented by the Plaintiffs. However, the testimony of Mr. Shvartzman must be discredited in its entirety due to the clear credibility issues as Mr. Shvartzman has a notorious propensity to deceive and lie. Mr. Shvartzman was a named defendant in other cases with fraud being one of the causes of action. In fact, even in the present matter, he has been found liable to the Plaintiffs for fraud, which is an act involving lying and deceitful conduct that has a direct bearing on his credibility as a witness. Same can be stated about his willful disobedience of prior Court orders and designed actions to hide documents and further discovery from the Plaintiffs.

As such, the checks and cash transaction presented by the Plaintiffs through Exhibits and testimony of Plaintiffs' witnesses totaling $144,702.50 must be accepted by this Court and awarded to the order of the Plaintiffs. Compensatory damages for fraud should be "sufficient to place the plaintiff in the same financial position he would have occupied absent the illegal conduct." *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1100,

1106 (2d Cir. 1988). The "general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 768-69 (2d Cir. 1994). Plaintiffs proved their damages and expenses and should be duly awarded the same.

## **PRE-JUDGMENT INTEREST**

Since the Plaintiffs have asserted well-pleaded pendent state claims for fraud, they are also entitled to pre-judgment interest on those claims under New York law. *See Olcott v. Delaware Flood Co.,* 327 F.3d 1115, 1126 (10th Cir. 2003); *Tosto v. Zelaya,* No. 99 Civ. 11864, 2003 U.S. Dist. LEXIS 8085, at 23-24 (S.D.N.Y. May 12, 2003). Under New York law, awarding pre-judgment interest on damages awarded for fraud is mandatory.[3] *See Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 28 (2d Cir. 1986); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 693-95 (2d Cir. 1983); *Tosto,* 2003 U.S. Dist. LEXIS 8085, at 23-24.

Whether pre-judgment interest is awarded under federal or state law, federal courts have ordinarily looked to state law in determining the appropriate interest rate. *See SEC v. Musella,* 748 F. Supp. 1028, 1032 (S.D.N.Y. 1989), *aff'd,* 898 F.2d 138 (1990). New York CPLR section 5001(b), which governs awards of pre-judgment interest, provides that in general:

> "Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each time from the date it was

9

incurred or upon all of the damages from a single reasonable intermediate date."

Thus, pre-judgment interest on New York state claims should accrue as of the date the cause of action accrued. *See Tosto,* 2003 U.S. Dist. LEXIS 8085, at 23-24. In the instant case the cause of action accrued on the date the Plaintiff Yezerskiy made his last payment to the Defendants which was March 8, 2004, the day Mr. Yezerskiy issued a cash payment to Mr. Shvartzman in the amount of $10,000. *See In re Crazy Eddie Sec. Litig,* 948 F. Supp. at 1168 (E.D.N.Y. 1996) (defrauded investors would receive pre-judgment interest calculated from last investment made).

In the absence of a written contract which clearly specifies a different rate, pre-judgment interest should be awarded at the statutory rate of 9% authorized by CPLR section 5004. *Marine Management, Inc. v. Seco Mgmt., Inc.,* 176 A.D.2d 252, 574 N.Y.S.2d 207 (2d Dep't 1991), *aff'd,* 80 N.Y.2d 886, 600 N.E.2d 627, 587 N.Y.S.2d 900 (1992). Any pre-judgment interest awarded should be calculated on a simple interest basis. *See Marfia v. T.C. Ziraat Bankasi,* 147 F.3d 83, 90 (2d Cir. 1998); *Novomoskovsk Joint Stock Co. v. Revson,* No. 95 CIV. 5399, 1999 WL 767325, at 3 (S.D.N.Y. Apr. 29, 1999).

Accordingly, as of October 10, 2008, Plaintiffs are entitled to no less than $59,689.80 in interest on the $144,702.50 of which they were defrauded.

## **PUNITIVE DAMAGES**

The case law in New York is clear, in order to obtain punitive damages in ordinary common law tort actions, a New York plaintiff must show not only that the defendant committed a tort, but also must demonstrate the existence of "circumstances of

aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton." *Carvel Corp. v. Noonan*, 350 F.3d 6, 24 (2d Cir. 2003) (quoting *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479, 626 N.E.2d 34, 605 N.Y.S.2d 218 (1993)). Additionally, under New York Law, a plaintiff seeking punitive damages for fraud must demonstrate that a defendant acted with "a wanton or reckless disregard of plaintiff's rights." *Giblin v. Murphy*, 73 N.Y.2d 769, 772, 532 N.E.2d 1282, 536 N.Y.S.2d 54, 56 (1988). Such a wanton or reckless disregard entitling the Plaintiffs to punitive damages can be established by a simple showing of the Defendants repeated affirmative misrepresentations to the Plaintiff's. *See PSG Poker, LLC v. DeRosa-Grund*, 2008 U.S. Dist. LEXIS 62379 (S.D.N.Y., August 15, 2008).

Defendants refused to comply with repeated discovery requests and orders. As a result of their repeated failure to comply with this court's orders the Defendants answer was stricken and the question of liability as to the fraud cause of action was resolved in favor of the Plaintiffs. As such the Plaintiffs have met their burden of establishing all elements of fraud, including the existence of affirmative misrepresentations entitling the Plaintiffs to punitive as well as compensatory damages.

The Plaintiffs have demonstrated that the Defendants were engaged in a fraudulent scheme designed to defraud the Plaintiffs out of their money disguising the fraud as a sale of viable and lucrative gas station business. During the sale transaction, Defendants made a multitude of deliberate misrepresentations about the gas station business, its profits, and its underlying operations. Following the completion of the

11

"sale" of the gas station to the Plaintiffs, the Defendants continued to collect all monies generated from the sale of fuel and other goods at the gas station even though they were no longer entitled to such revenue. Defendants' failure to comply with discovery requests seeking access to the corporate books of 3801 Beach Channel Inc. left the Plaintiffs without exact calculation and information as to how much monies the Plaintiffs were wrongfully denied during those months of the stations operation prior to eviction. As such, the Plaintiffs are denied the ability to accurately gauge the full scope of the damages they were subjected to.

The amount of punitive damages to be awarded lies within the discretion of the court. *See Qualis Care,* 1999 U.S. Dist. LEXIS 13417, 1999 WL 683564, at 8; *Nardelli v. Stamberg,* 44 N.Y.2d 500, 503, 377 N.E.2d 975, 406 N.Y.S.2d 443, 445 (1978). The U.S. Supreme Court has provided three "guideposts" to assess the reasonableness of punitive damage awards, but these standards apply to *ex post* review of an award already granted. *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). The guideposts are "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *Gore*, 517 U.S. at 575).

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm,* 538 U.S. at 418 (quoting *Gore,* 517 U.S. at 575). "Courts should determine the reprehensibility of a defendant's conduct by considering whether: the harm caused was physical rather than

economic, the conduct involved repeated actions or was an isolated incident and the harm was the result of intentional malice, trickery, or deceit." *Lukaszuk v. Sudeen*, 2008 U.S. Dist. LEXIS 95919, at 28-29; see also *State Farm,* 538 U.S. at 418. As to the second and third guideposts, punitive damages must be "both reasonable and proportionate" to the amount of harm to the plaintiff and the compensatory damages awarded. *See State Farm,* 538 U.S. at 426; *Gore,* 517 U.S. at 580. Moreover, it is well established that the court should avoid duplicating components of the compensatory damages award with a punitive damage award. *See State Farm,* 538 U.S. at 426. In fraud cases the Supreme Court has recognized that a punitive damages award of "more than 4 times the amount of compensatory damages" might be "close to the line" of what is constitutionally permissible. *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991); see also *BMW of N. Am.*, 517 U.S. at 582 (noting that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages").

  Defendants' conduct towards the Plaintiffs and even towards this Court is particularly reprehensible. Plaintiffs sustained severe economic damages as a result of Plaintiffs fraudulent actions above and beyond what has been admitted into evidence during the damages inquest. Plaintiffs are immigrants that saved every dollar they had in order to achieve their American dream and own their own business. As Plaintiffs witnesses testified, they even borrowed money from friends and relatives to help them with the purchase of this business. That money was wrongfully swindled from them by the Defendants, who are wealthy businessmen that were interested in nothing more than

to defraud their naïve pray.  As testimony of the Plaintiffs witnesses clearly establishes, Defendant Shvartzman was committing a multitude of criminal and illegal activities at the gas station at the time of sale.  Plaintiffs refused to further such illegal activity and were forced out of the business.  As a result, they lost allot more than just the money invested.  The fraud and loss of their money, which Shvartzman refused to refund even though he took back the gas station, threw the Plaintiffs and their family into a financial turmoil, while Shvartzman was profiting from the same.  The loss of money to Shvartzman created rifts between the Plaintiffs as father and son and their family member that were owed money.  Their American dream and their family was crushed by the hands of the Defendants and their egregious acts of fraud.

The Defendants even went further to show their true colors by blatantly disrespecting this Courts authority.  As clearly documented by the multiple correspondence from the Plaintiffs on the record, Defendants failed continuously to abide by this Courts directives displaying their disregard for the Court itself and the legal system.  Showing up to Court late on multiple occasions, failing to provide discovery mandated by the Court, filing a frivolous appeal, and disrupting and prolonging the inquest with a multitude of frivolous and groundless objections is just to name a few of the instances of Defendants'' reprehensible conduct.  Particularly alarming is the fact that Mr. Herman is an attorney duly admitted to practice law in this state.  As such, even such title carried by him failed to deter him from acting in clear disregard of the acceptable legal procedures and principles.

This Court must find that punitive damages in an amount equal to at least 4 times the compensatory damage award are just and proper.  Such an award would adequately

serve to compensate Plaintiffs for their economic and none-economic losses as well act as a strong deterrent to the Defendants from purporting same or similar fraudulent acts and conduct that they have exhibited during the course of this matter.

## **ATTORNEY'S FEES**

It is well-settled law in the State of New York that "[u]nder the general rule, attorneys' fees and disbursements are incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court rule." A.G. Ship Maintenance Corp v. Lezak, 69 N.Y.2d 1, 511 N.Y.S.2d 216 (1986); Hooper Associates, Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 74 N.Y.2d 487, 549 N.Y.S.2d 365 (1989). In the instant action, Paragraph 9 of the "Sale of Assets agreement," introduced into evidence as Defendant's Exhibit A, provides for "reasonable attorney's fees arising out of the breach of any representation or warranty" in the agreement. Since there is no longer any question pending before this court as to whether the Defendants breached their representations and warranties, the Plaintiff's are entitled to reasonable attorney's fees under the agreement.

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 18 (2d 2007), this circuit clarified the confusion that long surrounded the calculation of attorneys fee awards. The court modified the old rule which it said utilized no more than a "pretense of mathematical precision." The court abandoned the old lodestar formula, holding "The meaning of the term 'lodestar' has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness. This opinion abandons its use." Id. at 190. The court shifted the focus away from calculating what is or

is not a reasonable hourly rate under the lodestar approach more towards determining what the "presumptively reasonable fee" is. Id.

In calculating the presumptively reasonable fee the court held that market forces should be the primary focus of the courts inquiry. "Our fee-setting jurisprudence has become needlessly confused -- it has come unearthed from the free market it is meant to approximate. We therefore suggest that the district court consider, in setting the reasonable hourly rate it uses to calculate the "lodestar," what a reasonable, paying client would be willing to pay. " Id. at 184. In determining what a reasonable paying client would be willing to pay the court outlined several factors that should be considered: "the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any) [emphasis added], the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation." Id.

In the instant case the Plaintiffs were free to shop around for counsel. However, the Plaintiffs are immigrants from the former Soviet Union with a limited command of English. As such, they gravitated towards the relatively small number of Russian speaking attorneys in their own community. Our firm is one of the relatively few firms

with Russian speaking attorneys willing to litigate federal cases of this type. The Plaintiffs ultimately signed a retainer agreement with our firm knowing full well the rate charged for our services. Absent a showing of unreasonableness, not of the rate we charge, but of our client's decision to hire or pay us this court should accept the hourly rate agreed to in our retainer as the appropriate rate. To determine whether our client acted reasonably or to determine what the reasonable client would be willing to pay in a case like this the court must examine the state of the legal market the client was faced with.

> "To define markets simply by geography is too simplistic. Sometimes, legal markets may be defined by practice area….On the other hand, many cases …are intrinsically local, and the relevant legal market may be coextensive with or smaller than the district itself [emphasis added]. By asking what a reasonable, paying client would do, a district court best approximates the workings of today's market for legal services." Id. at 192.

In the present matter, Plaintiffs incurred significant legal fees in connection with the fraudulent representations and various breaches of contract provisions. As per Plaintiffs Exhibit "13", the total attorney's fees incurred by Plaintiffs on and prior to September 3, 2008 was $45,958.00. From September 3 to the present date, Plaintiffs incurred additional fees in the amount of 30 hours or $12,000.00. Such time was necessitated for the preparation of witnesses and exhibits for the inquest and the conduction of the inquest over the course of two days. These hours and fees do not include the time spent for the conference on September 4, 2008, during which the Court

17

made a determination that Plaintiffs attorney was responsible for any time spent due to the failure to provide a court certified interpreter for Plaintiffs witnesses. Defendants were also sanctioned and ordered to pay to the Plaintiffs the attorneys fees necessitated with compliance with the Court order of December 22, 2007. Such fees were submitted by Plaintiffs attorney in his Affidavit on the record to be in the amount of $10,700.00 and are a part of the $45,958.00 as stated earlier. As such, Plaintiffs ask that the Court order Defendants to compensate Plaintiffs for the attorney's fees incurred in the total amount of $57,958.00 in addition to the costs and disbursement of this action to be awarded to the Plaintiffs.

## **SUMMARY**

It is clear and convincing by the pleading in the Complaint, the record, testimony of the Plaintiffs as witnesses, and the admitted evidence, that Defendants committed common law fraud among many other wrongdoings towards the Plaintiffs. Although the main focus of the damages inquest was on the actual economic damages sustained by the Plaintiffs, I respectfully ask this Court to look at the overall picture and see the amplitude of suffering above and beyond those economic damages. Throughout the progression of this case, Defendants consistently made a mockery of the judicial process and brushed of the significant harm their actions have caused to the Plaintiffs. They have utilized every possible stalling tactic and roadblock to intentionally prolong this matter and drain Plaintiffs resources with hopes of depleting them. I have dedicated a significant amount of time to this matter for which I have yet to be compensated only because I truly identify with Plaintiffs cause and mission to bring these Defendants to justice. These Defendants displayed disregard for well established legal and moral principles and even went as far

as to disrespect the clear directives of this Court. Unlike the Defendants, one of whom is a wealthy businessman and the other is an attorney with his own practice, Plaintiffs are a poor immigrant family truly without any adequate means of support. The only hope that remains for the Plaintiffs is the justice to be done by this Court restoring and providing them with adequate compensation from the Defendants to attempt a comeback from the financial crisis and emotional turmoil that they were subjected by the Defendants for almost 5 years. Maybe they can even attempt another shot at their American dream of having their own business. Plaintiffs ask nothing more other than that justice is done.