**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
3801 BEACH CHANNEL, INC., et al.,

                        Plaintiffs,

           - against -

YACOV SHVARTZMAN, et al.,
                        Defendants.
-----------------------------------------------------------X

**REPORT AND RECOMMENDATION**

05-CV-0207 (CBA) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

      Plaintiffs 3801 Beach Channel, Inc. ("Beach Channel") and Yevgeniy Yezerskiy ("Yevgeniy") seek damages and equitable relief in connection with a fraud allegedly perpetrated on them – and on Yevgeniy's father – by defendants Beach Channel Services, Inc. ("BCS"), Yacov Shvartzman ("Shvartzman"), Alexander Herman ("Herman"), and Alexander Iorsh ("Iorsh").  Docket Entry ("DE") 1 (Complaint).  After striking the defendants' answer for good cause and dismissing Count One of the Complaint – the plaintiffs' sole federal cause of action – for failure to state a claim, the Honorable Carol B. Amon, United States District Judge, granted a default judgment on the plaintiffs' remaining claims and referred the matter to me for a damages inquest.  DE 69.  I now make my report and, for the reasons set forth below, respectfully recommend that the court enter judgment in favor of Yevgeniy alone against defendants Shvartzman and BCS on Count Two of the Complaint, and award a total of $181,728.37, consisting of $113,972.50 in compensable losses and $67,755.87 in prejudgment interest; I further respectfully recommend that the court grant the contract rescission requested in Count Four; and I also respectfully recommend that the court deny all of the plaintiffs' remaining requests for relief (including their claims for attorneys' fees), dismiss Count Two against defendants Herman and Iorsh, and dismiss Counts Three, Five and Six against all defendants.

I.      Background

        A.      The Plaintiffs' Allegations

        The Complaint alleges that, sometime before February 20, 2004, defendant Shvartzman

placed an advertisement in two Russian-language newspapers, advertising the sale of a gas

station which was owned by corporate defendant BCS.  Complaint ¶¶ 26-29.  Yevgeniy and his

father, non-party Yefim Yezerskiy ("Yefim"),[1] who were then seeking to acquire a business, saw

---

[1] Although Yefim is listed as a plaintiff on the docket, the Complaint does not name him as a party in the caption, does not mention him in the paragraphs describing each of the "PARTIES[,]" *id*. at 1 & ¶¶ 1-8, and includes no allegations suggesting that he is a party to this lawsuit. *See id*. ¶¶ 9-143.  Indeed, the first reference to Yefim in the Complaint strongly suggests he is not a party:

> That Plaintiff Yezerskiy is a Russian emigre who has been in this country for approximately eight years and, together with his father, Yefim Yezerskiy, was interested in securing a business that he could own and operate as a source of income and an opportunity to build a future.

*Id*. ¶ 16.  That allegation plainly conveys that Yevgeniy is a party but that his father Yefim is not. Consistent with that understanding, the Complaint goes on to refer repeatedly to actions taken by the "Plaintiff and his father[.]"  *Id*. ¶¶ 19, 30-31.  It also frequently, in other contexts, refers to the "Plaintiff" in the singular.  *Id*. ¶¶ 20, 35-39, 53, 58-60, 62, 66-67, 112.  The latter usage is far easier to understand if the Complaint's author disregarded the difference between Yevgeniy and the corporation through which he sometimes acted than if the drafter understood that he was writing a complaint on behalf of two separate individuals in addition to a corporation.

        Based on inquiry with the Clerk's office, it appears that the following explains the fact that Yefim is incorrectly listed as a named plaintiff.  On February 29, 2008, the court's *Pro Se* Office received a letter purporting to be from "Plaintiffs Yevgeniy Yezerskiy, [and] Yefim Yezerskiy."  The letter bore the typed names (but no signatures) of both Yevgeniy and Yefim; it was not signed by the plaintiffs' counsel.  DE 78.  Even after the filing of that letter, Yefim was not listed on the docket as a party.  Over two years later, on March 23, 2010, the *Pro Se* Office received another similar letter, this one dated March 12, 2010, that again purported to be from "Plaintiffs Yevgeniy Yezerskiy, [and] Yefim Yezerskiy" and that bore the typed names of both Yefim and Yevgeniy (although it bore the signature of Yefim alone); this letter, too, was not signed by counsel, even though the plaintiffs continued to be represented.  This letter, like its predecessor, purported to identify Yefim as a plaintiff, and it appears that someone in the Clerk's office added Yefim's name to the docket that same day – apparently under the understandable but

the advertisement, contacted Shvartzman,[2] and began negotiations to purchase the gas station. *Id.* ¶¶ 16, 19, 30-31. The three men eventually reached an agreement on the terms of the purchase. *Id.* ¶¶ 31-33, 37. Yevgeniy engaged counsel in connection with the acquisition; Shvartzman and BCS were represented by defendant Herman, an attorney who had represented Shvartzman in other business matters. *Id.* ¶¶ 6-7, 38-41.

The plaintiffs claim that the defendants never intended to permit them "to take custody and control of the business" or to collect its revenues, and that in fact they never did so. *Id.* ¶¶ 55-56.[3] They further allege that, unbeknownst to them, the defendants had misrepresented or omitted certain facts during the negotiation and sale, including that the lease for the gas station's premises was "not in good standing" and that the agreement with the gas station's franchisor, Sunoco, Inc. ("Sunoco"), was in default. *Id.* ¶¶ 27, 47, 119-24. The plaintiffs further claim that the defendants comprised a criminal enterprise, the activities of which involved the sale of the

---

mistaken impression that Yefim was a party whose name had somehow been omitted from the docket. Notwithstanding that mistake, it is clear that Yefim has never been named as a party, and the plaintiffs' counsel's submissions have been consistent with that understanding. *See*, *e.g.*, DE 77 at 1 (letter from plaintiffs' counsel referring to his firm as "attorneys for the plaintiffs, 3801 Beach Channel, Inc. and Yevgeniy Yezerskiy," and making no mention of Yefim as a party) (capitalization removed). Moreover, counsel has never made any effort to amend the Complaint to name Yefim as a plaintiff. As discussed below, the fact that Yefim is not a party limits the extent to which the court should grant the plaintiffs' requests for relief.

[2] The Complaint does not specify Shvartzman's position at the gas station, but it plainly conveys an assertion that he had sufficient authority to act on its behalf. *See id.* ¶¶ 24, 26-33, 121-23. As discussed below, evidence adduced at the inquest demonstrates that he is the sole owner of BCS.

[3] In referring to the "defendants" I exclude the five "John Doe" individual defendants and five "ABC Corp." corporate defendants who were named in the Complaint but never identified.

gas station to the plaintiffs and a series of violations of state and federal law that the plaintiffs describe as "racketeering activities." *Id.* ¶¶ 62-118. [4]

B.    Proceedings

The plaintiffs filed their Complaint on January 13, 2005. In their first count, the plaintiffs purported to assert a cause of action under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). Complaint ¶¶ 62-118. Count Two raises a claim of common law fraud. *Id.* ¶¶ 119-24. In the remaining counts, the plaintiffs do not raise any distinct claims of liability, but instead set forth the basis for requesting different forms of relief. Thus, Count Three asserts a claim for punitive damages on the basis of the same conduct at issue in the first two counts, *id.* ¶¶ 125-28; Count Four seeks rescission of the transaction involving the gas station, *id.* ¶¶ 129-32; Count Five seeks an injunction barring the defendants from any further efforts to sell or lease the gas station, *id.* ¶¶ 133-37; and Count Six seeks an accounting of the gas station's earnings, *id.* ¶¶ 138-43.

As discovery proceeded, the defendants repeatedly failed to discharge their obligations. After repeated efforts to secure compliance failed, the court struck the defendants' answer and

---

[4] The plaintiffs also allege that BCS, Shvartzman, and Iorsh – whom they describe as a "manager of the station" and a "principal" of BCS, *id.* ¶¶ 49-50 – employed Yevgeniy to work as an attendant at the gas station, paying him under the table and less than minimum wage. They contend that in doing so, the defendants violated the Fair Labor Standards Act. *See id.* ¶ 61. The Complaint, however, does not assert such a claim as an independent cause of action, and the plaintiffs have not sought any relief predicated on the alleged violation of the wage laws. *See id.* at 22-23 (prayer for relief, specifying relief requested for each specific count). In such circumstances, even if the alleged wage law violation could be considered to assert a separate cause of action, the plaintiffs would be precluded from seeking any relief on that basis. *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2663 (3d ed. 1998) ("[A] default judgment may not extend to matters ... beyond the scope of the relief demanded.").

entered their defaults. DE 69 (order); DE 67 (Report and Recommendation) at 4-10. However, because the plaintiffs' RICO claim was facially defective, and because they declined to make any substantive amendment that would cure the Complaint's defects on that score, *see* DE 67 at 14-19, the court *sua sponte* dismissed it with prejudice, and referred the remaining state law claims to me for an inquest as to damages. DE 69.

I conducted an evidentiary hearing as to damages on September 4, 17, and 26, 2008. *See* DE 97 (transcript of hearing ("Tr.") 1-50); DE 98 (Tr. 51-127); DE 99 (Tr. 128-250). The plaintiffs relied primarily on the testimony of Yevgeniy and Yefim and the documents they sponsored,[5] and the defendants presented Shvartzman's testimony. The plaintiffs also introduced documentary evidence of payments they claimed to have made in connection with the purchase of the business and for certain expenses of the business after their purchase; and the defendants introduced documents that purported to memorialize their agreement to sell the business and the plaintiffs' subsequent renunciation of that agreement. *See* DE 93 (plaintiffs' post-hearing memorandum) ("Pltf. Mem."); DE 94 (defendants' post-hearing memorandum) ("Def. Mem.").

II.    Discussion

A.    Default

When a defendant defaults, the court must accept as true all well-pleaded allegations in the complaint, except those pertaining to the amount of damages. Fed. R. Civ. P. 8(b)(6); *see Finkel v. Romanowicz*, 577 F.3d 79, 83 n.6 (2d Cir. 2009) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims: a default does not

---

[5]  The plaintiffs presented the testimony of a third witness, an employee of the plaintiffs' counsel, whose testimony had little if any relevance to the issue of damages. *See* Tr. 7-19.

establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading. With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action. *See, e.g.*, *id.* at 84; *Directv, Inc. v. Neznak*, 371 F. Supp. 2d 130, 132-33 (D. Conn. 2005) (denying default judgment on several claims based only on conclusory allegations which lacked a sufficient factual basis for a finding of liability); *see also Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971) (default-based liability is established by "well-pleaded allegations in a complaint"), *rev'd on other grounds*, 409 U.S. 363 (1973); *Greyhound Exhibitgroup*, 973 F.2d at 159 (complaint's assertion of proximate cause necessary for finding of liability must be "properly alleged"); *Levesque v. Kelly Commc'ns, Inc.*, 1993 WL 22113, at *5 (S.D.N.Y. Jan. 25, 1993) ("[T]he Court must be satisfied initially that the allegations of the complaint are 'well-pleaded.'") (citing *Trans World Airlines*, 449 F.2d at 63). The entry of default does not relieve the plaintiffs of their burden of proving their damages; rather the court must conduct an inquiry and award only those damages that the plaintiffs prove to a "reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (citing *Transatl. Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)).

    B.    <u>Count Two:  Common Law Fraud</u>

       1.    <u>Liability</u>

To state a cause of action for fraud under New York common law, a plaintiff must allege that a defendant made a misrepresentation of fact that the defendant knew to be false for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff justifiably did rely on it and

suffered injury as a result. *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999). "New York law recognizes fraudulent omission as a permutation of the common law action for fraud," although "[a]n omission is actionable only in the context of a duty to disclose." *Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *9 (S.D.N.Y. Apr. 21, 2004). Such a duty arises in three situations: "first, where the party has made a partial or ambiguous statement ... ; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citations and internal quotation marks omitted).

In addition to the substantive elements, a federal plaintiff asserting a fraud claim must also meet special pleading requirements, namely to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). Thus, the plaintiffs must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996). "[T]o serve the purposes of Rule 9(b), [courts] require plaintiffs to allege facts that give rise to a strong inference of fraudulent intent," which plaintiffs can establish either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). If a plaintiff fails to satisfy the requirements of Rule 9(b), entry of default judgment should be denied. *Liberty Mut. Ins. Co. v. Luxury Transp. Mgmt. Inc.*, 2009 WL 1033177, at *1, *8 (E.D.N.Y. Apr. 16, 2009).

a.      <u>Shvartzman</u>

Although the Complaint is rife with derogatory allegations about Shvartzman, none of those allegations ascribe to him any specific false representations or materially misleading omissions, with one exception that I reproduce here verbatim:

> Shvartzman and the other members of the [Shvartzman] Enterprise knew, or should have known, that virtually every representation made both orally and in writing contained in the Contract of Sale, as well as the failure to inform that the existing Contract with Sunoco was in default and that the Lease of the premises was not in good standing.

Complaint ¶ 121.  On its own terms, the latter statement is insufficient.  However, for the reasons that follow I conclude that the allegation, read against the context of the entire record, adequately supports a claim for common law fraud against Shvartzman.

The first part of the allegation, concerning "virtually every representation made both orally and in writing contained in the Contract of Sale," does not explicitly state that any such representation was false – instead, the paragraph meanders to a new thought.  In doing so, it is clear that the error is one of drafting, and not legal sufficiency; read in the context of the overall complaint, it is obvious the author intended to convey, at a minimum, that Shvartzman and others were responsible for the inclusion in the contract for the sale of the gas station a false material statement of fact.

Under other circumstances, I might recommend that the court require the plaintiffs to cure the drafting error by filing an amended complaint.  I do not make such a recommendation here for several reasons.  First, the context of the Complaint makes the intended meaning of the relevant paragraph plain.  Second, requiring an amended pleading to correct the drafting error would elevate form over substance:  the parties have already litigated the relevant issues on full

notice of the intended meaning of the plaintiffs' accusation. Specifically, although the defendants' misconduct during the discovery phase resulted in their default, they were nevertheless afforded ample opportunity to subject the plaintiffs' proof at the damages inquest to full adversarial testing. Third, the record developed at that damages inquest easily demonstrates that the allegations of fraud were true.

In particular, the defendants themselves introduced in evidence at the inquest a document that they characterized as a contract for the sale of the subject gas station signed on February 20, 2004, by both Shvartzman and Yevgeniy. Tr. 196-98; Def. Mem. Ex. ("DX") A (the "February 20 Contract").[6] That document contains explicit affirmative statements about the gas station that Shvartzman endorsed but that the Complaint's allegations – established by the defendants' default – prove to be false. *Compare* February 20 Contract § R3(h)(i) (including, among the "Representations and Warranties of Seller [BCS]", the assertion that "[t]he lease is in full force and effect and without any default by Seller or Yakov Shvartzman") *with* Complaint ¶ 121 ("the Lease of the premises was not in good standing"). Accordingly, notwithstanding the Complaint's drafting error, Shvartzman has had a fair chance to understand and contest the Complaint's implicit, if poorly drafted, accusation that he made a material misrepresentation of fact.

---

[6] While Yevgeniy acknowledged signing the February 20 Contract, he disagreed with Shvartzman's claim that the document set forth the final terms of the parties' agreement concerning the sale of the gas station. Tr. 172-73. Rather, he claimed that the February 20 Contract was superseded by another document signed on February 28, 2004. Tr. 173, 176. Yevgeniy referred to February 20, 2004 as the date of the "first closing" which was adjourned until February 28, 2004, to allow the parties to inquire into the gas station's debts. He added that there was a "second closing" on the latter date, at which the parties executed another contract with overlapping but somewhat different terms. Tr. 105, 173-76. The plaintiffs have never produced the allegedly superseding contract. Because the plaintiffs' accuse the defendants of fraud, rather than of breach, the dispute in that regard does not bear on the question of liability.

In addition to satisfying the requirement of showing a knowing misrepresentation, the plaintiffs have also met their burden of establishing Shvartzman's fraudulent intent. I do not mean to suggest that they have done so by simply making the conclusory allegation that the "Shvartzman Enterprise" – defined to include all four defendants as well as others, Complaint ¶ 63 – "embarked on a scheme to defraud." *Id.* ¶ 120. However, such an allegation does suffice where, as here, a complaint also provides a "'minimal factual basis that gives rise to a strong inference of fraudulent intent.'" *Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 111 (E.D.N.Y. 2009) (quoting *M & T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405, 412 (E.D.N.Y. 2004)); *see Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir. 1990).

As the sole owner of BCS, *see* February 20 Contract at 1; DX K at 1, Shvartzman would make money from selling the business, and he conducted negotiations with the plaintiffs in which he made representations about the business's operations and finances. Complaint ¶¶ 31-33, 37. Thus, the plaintiffs have established that Shvartzman had a motive and opportunity to commit fraud, thereby creating a strong inference of fraudulent intent. *See Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000) (finding allegation that corporate officers misrepresented company's performance or prospects to keep stock price high while selling their shares met motive requirement); *Icebox-Scoops*, 676 F. Supp. 2d at 111 (finding allegation of involvement in negotiations ending in sale met opportunity requirement). The plaintiffs also allege facts sufficient to support a strong inference of fraudulent intent by indicating Shvartzman misled the plaintiffs about problems with the gas station's lease and franchise agreement. Thus, they have adequately alleged fraudulent intent. *See Icebox-Scoops*, 676 F. Supp. at 111.

The plaintiffs also satisfy the remaining substantive elements of the tort of common law fraud. They have alleged that they relied on Shvartzman's misrepresentations, that they would not have completed the transaction or executed the promissory note or other instruments had they known the truth, and that they suffered monetary losses as a result. Complaint ¶¶ 35-36, 122-23.

Finally, the plaintiffs have also cleared the procedural hurdle of Rule 9(b). For the reasons set forth above, I conclude that the plaintiffs have adequately pleaded, and sufficiently explained the fraudulent nature of, Shvartzman's material misrepresentation. As for the requirement to identify the speaker and the time the fraud occurred, the plaintiffs alleged that "the representations and information" relied upon was "furnished by Shvartzman" and that the scheme to defraud began two months prior to the closing and continued through the date when the closing occurred. Complaint ¶ 120. While the Complaint did not explicitly identify the place of the misrepresentation, it alleged that the fraud continued at the closing at which the February 20 Contract was executed, *id.*, and the evidence in the record indicates that the closing occurred at Herman's office in Brooklyn, New York. Tr. 110; DX A (Agreement clause). In light of these details and for the reasons explained above, the Complaint gives rise to a strong inference of fraudulent intent, as required by Rule 9(b). *Shields*, 25 F.3d at 1128. I therefore respectfully recommend that the court find Shvartzman liable for common law fraud.

b.    BCS

"The principal is … liable for the agent's misrepresentations that cause pecuniary loss to a third party when the agent acts within the scope of his apparent authority." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 (1982); *Tew v. Chase Manhattan Bank*, 728 F. Supp. 1551, 1559 (S.D. Fla. 1990) ("In the case of a corporation, which can act only through

its agents, the rule is that the actions of corporate directors and officers are attributable to the corporate entity."), *amended in part*, 741 F. Supp. 220 (S.D. Fla. 1990); *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (1985) (finding rule applicable to imputing corporate agent's knowledge and acts to corporation). On that basis, a court may impose liability on corporations for the acts of their agents acting within the scope of their authority. *See In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 471-72 (S.D.N.Y. 2010); *Assets Collecting Co. v. Barnes-King Dev. Co.,* 198 F. 82, 84 (2d Cir. 1912); 2A N.Y. Jur. 2d *Agency* § 306 (2010); *cf. United States v. Paccione*, 949 F.2d 1183, 1200 (2d Cir. 1991) ("acts of individuals on [the corporation's] behalf may be properly chargeable to it" (internal quotation marks omitted)). More specifically, in the context of a fraud claim, "a principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority." *Citibank N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 624 (2d Cir. 1989) (citing *Am. Soc'y of Mech. Eng'rs*, 456 U.S. at 566).

While the Complaint refers to actions and omissions by Shvartzman, the evidence in the record makes clear that in selling the business, he acted as the agent of BCS. The plaintiffs allege that BCS owned the gas station. Complaint ¶ 26. Further, they allege that Shvartzman conducted several transactions in the corporation's name, including leasing the gas station premises, placing advertisements for the sale of the station, and negotiating the sale of the business. *Id*. ¶¶ 24, 26-33, 121-23. Additionally, while the February 20 Contract indicates that the agreement was between Yevgeniy, as the "Buyer," and Shvartzman, not BCS, as the "Seller," DX A at 1 (Agreement clause), it also indicates that the transaction was a sale of "all of the assets of [BCS]" and that Shvartzman, who is listed as the "sole owner" of BCS, was "desirous of selling [these] assets." DX A at 1 (Whereas clauses). From these allegations and the evidence, it

is apparent that Shvartzman was acting as BCS's agent in carrying out the sale of the gas station and that he acted within the scope of his authority as sole owner in doing so. *See F.T.C. v. Five-Star Auto Club, Inc.*, 93 F. Supp. 2d 502, 535-36 (S.D.N.Y. 2000) (finding president and sole owner had authority to control corporation); 14A N.Y. Jur. 2d *Business Relationships* § 624 (2010) ("[T]he general rule is that acts done by executive officers of a corporation, within the apparent scope of their authority regarding the regular business of the corporation, are binding on it, and that those dealing with such officers are not required to prove specific authority from the board of directors.").  I therefore respectfully recommend that the court find BCS liable for Shvartzman's fraudulent acts.[7]

           c.      <u>Herman</u>

The Complaint does not adequately plead a fraud claim against Herman.  In describing the role of each defendant, it alleges no more than that, as an attorney representing Shvartzman, he knew or should have known about the falsity of certain representations that Shvartzman made, and that the entire transaction was a fraudulent scheme.  Complaint ¶¶ 40-48.  Thereafter, in the critical paragraph of the fraud claim, the plaintiffs assert that the "members of the Enterprise" – a term previously defined to include Herman, among others – "knew, or should have known, that virtually every representation made" in connection with the sale of the gas station was false[8] and failed to reveal that "the existing Contract with Sunoco was in default and that the Lease of the premises was not in good standing."  *Id.* ¶ 121.

---

[7] Moreover, the inquest evidence showed that BCS benefitted from the transaction at issue:  for example, Yevgeniy deposited $10,000 into its bank account to fund a Sunoco gasoline purchase.

[8] Here again, as noted above, I assume that the plaintiffs made a mere drafting error in failing to make explicit the assertion that statements made in the course of the transaction were false.

Such pleading fails to attribute any false affirmative representation to Herman. All such representations are explicitly attributed to Shvartzman, acting on behalf of BCS. *See*, *e.g.*, *id.* ¶ 45 ("Herman knew … that many of the representations *set forth by Defendant Shvartzman* … were false") (emphasis added).

Accordingly, the claim against Herman necessarily requires a showing that Herman was responsible for a fraudulent omission. And to make the latter showing, the plaintiffs must demonstrate that Herman had an affirmative duty to disclose information to them about the status of the Sunoco franchise agreement or the gas station's lease. *See Century Pac.*, 2004 WL 868211, at *9. Although the Complaint does contain such a conclusory assertion, *see* Complaint ¶ 47 (alleging that Herman "had the duty to disclose" the Sunoco agreement's default to "the Purchaser and Purchaser's attorney"), that does not suffice.

The Complaint does not identify any reason why Herman should be deemed to have had an affirmative duty to disclose on any of the three grounds that create such a duty. *See Brass*, 987 F.2d at 150. First, the plaintiffs do not claim that Herman made a "a partial or ambiguous statement, on the theory that once [he had] undertaken to mention a relevant fact ... [he] cannot give only half of the truth," since they do not establish any affirmative representations whatsoever by him. *Id.* Second, they do not allege a fiduciary or confidential relationship between Herman and themselves. *See Estate of Ginor v. Landsberg*, 960 F. Supp. 661, 661 (S.D.N.Y. 1996) (holding that attorney owed no duty of disclosure to non-client and hence could not be liable in fraud for non-disclosure); *Schlaifer Nance & Co. v. Estate of Warhol*, 927 F. Supp. 650, 661 (S.D.N.Y. 1996) (same). Third, they do not establish that Herman "possesse[d] superior knowledge, not readily available to [them], and [knew] that [they were]

14

acting on the basis of mistaken knowledge." *Brass*, 987 F.2d at 150.  While their allegation of Herman's awareness of the problem with the Sunoco contract certainly constituted superior knowledge to which they did not have ready access, the Complaint does not allege – and nothing in the record demonstrates – that Herman himself knew that the plaintiffs were acting on an a misimpression about that agreement.

The record therefore does not demonstrate that Herman made a false representation or that he failed to discharge a duty to cure an omission.  It establishes no more than that he served as counsel to a client who defrauded the plaintiffs – and that plainly does not suffice to make him liable for the client's fraud.  *See Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 494 (S.D.N.Y. 2003) (collecting cases in support of the proposition that "lawyers ... do not have a duty to 'blow the whistle' on their clients").  I therefore respectfully recommend that the court decline to find Herman liable for common law fraud, and that it instead dismiss that claim against him.

d.    <u>Iorsh</u>

The Complaint makes only five allegations specifically about Iorsh:  he was a "principal directly or indirectly in" BCS, Complaint ¶ 49; he was the gas station's manager and "participated in" Shvartzman's "activities[,]" *id.* ¶ 50; he "actively assisted the members of the Enterprise in promulgating the scheme herein set forth[,]" *id.* ¶ 51; he was "a co-conspirator in the Enterprise as alleged[,]" *id.* ¶ 52; and that Shvartzman, Iorsh, and BCS together "were utilizing [Yevgeniy] as a gasoline attendant, paying him $4 an hour in currency[,]" *id.* ¶ 57.  Those allegations, even considered against the backdrop of the rest of the record, do not suffice to state a fraud claim against Iorsh.  As with Herman, there is nothing to suggest that Iorsh himself made or was responsible for any affirmative misrepresentation or that he had a duty to

cure any omission. Nor does the fact that the operative paragraph of the fraud count ascribes knowledge of the false statements and material omissions to all members of the "Enterprise" cure the defect. *See Liberty Mut. Ins. Co. v. Luxury Transp. Mgmt. Inc.*, 2009 WL 1033177, at *8 (E.D.N.Y. Apr. 16, 2009) (declining to assume that "allegations referring to the 'defendants' as a group are ... true as to every defendant" or to accept that allegation that defendant was a "principal" sufficed to establish involvement in corporation's fraud absent allegations that he "prepared, signed, or submitted" document containing falsehoods).

On this record, the only arguable basis for holding Iorsh liable for the fraud is as a result of his interest in BCS: "Officers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it .... " *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (alteration and internal quotation marks omitted). There are two reasons why I recommend against such a finding of derivative liability. First, the Complaint does not actually allege that Iorsh was an officer or director of BCS – it says no more than that he was "a principal directly or indirectly in" that company. Complaint ¶ 49. While I imagine it would be accurate to describe an officer or director in that manner, it is apparent that the phrase also encompasses a broad range of other relationships, not all of which would be amenable to the same theory of liability. All that the record establishes is that Iorsh managed the gas station – it does not provide any further information about his role in BCS. As a result, there is no basis to find him liable for the company's fraud. Second, the Complaint's allegations concerning Iorsh's knowledge of and participation in Shvartzman's fraudulent conduct is purely conclusory. Such pleading would suffice if, as with Shvartzman, other allegations in the Complaint created a strong inference that Iorsh intended to defraud the plaintiffs. *See Shields*, 25 F.3d at 1128. But

the Complaint includes no such allegations: it does not assert that Iorsh had any involvement in the negotiations for the sale of the gas station or indeed that he even knew of any problem affecting the lease or with the franchise agreement. I therefore respectfully recommend that the court decline to find Iorsh liable for common law fraud, and that it instead dismiss that claim against him.

 2. Damages

 Having established that Shvartzman and BCS are liable for fraud, the plaintiffs must next prove their damages to a "reasonable certainty." *Credit Lyonnais*, 183 F.3d at 155. While the plaintiffs have claimed that they were damaged by paying various sums to different parties, "damages for fraud must be the direct, immediate, and proximate result of the fraudulent misrepresentation." *Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 307 (2d Cir. 1986). Under this "out-of-pocket" rule, a defrauded plaintiff may recover only actual pecuniary loss, not lost profits or any benefit that the plaintiff expected to acquire but for the defendant's fraudulent conduct. *Vaughn v. Consumer Home Mortg. Co.*, 470 F. Supp. 2d 248, 269-70 (E.D.N.Y. 2007); *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370 (N.Y. 1996). In addition, only damages to parties are compensable. *See Helft v. Allmerica Fin. Life Ins. and Annuity Co.*, 2009 WL 815451, at *3 (N.D.N.Y. Mar. 26, 2009) (plaintiffs lack standing to recover on behalf of a non-party); *see also Philip Morris USA v. Williams*, 549 U.S. 346, 353-54 (2007) ("[A] defendant threatened with punishment for injuring a nonparty victim has no opportunity to defend against the charge."); *Warm v. Seldin*, 422 U.S. 490, 499 (1975) (holding that "Article III judicial power exists only to redress or otherwise to protect against injury *to the complaining party*" and prudential requirements likewise require that "the plaintiff generally must assert his

own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties") (emphasis added). While Yefim appears to have been involved in many aspects of the purchase of the gas station and to be just as much a victim of the defendants' fraud as Yevgeniy, he is not a party to this case and his losses are therefore not recoverable. With the foregoing principles in mind, I address each component of the plaintiffs' request for compensatory damages.

    a.    <u>Payments For The Purchase Of The Gas Station</u>

The plaintiffs seek damages based on the following payments they claim to have made towards the purchase of the gas station:

- a check for $2,000 that Yevgeniy gave to Shvartzman on January 26, 2004, Tr. 80-83, 170-71; Pltf. Mem. Ex. ("PX") 4 (copy of check);

- a check for $23,000 that Yevgeniy gave to Herman on February 20, 2004, Tr. 83-85, 175; PX 8 (copy of check)

- a check for $57,000 that Yevgeniy gave to Shvartzman on February 28, 2004, Tr. 38-42; PX 6 (copy of check); and

- $28,000 in cash that was paid to Shvartzman at the closing, $8,000 of which went toward the down payment for the business and $20,000 of which was for rent and a security deposit, Tr. 46-47, 70, 74-76, 154, 168.

The evidence at the inquest adequately demonstrated that all of the claimed payments were made as a result of the fraud. The checks, totaling $82,000, are all plainly Yevgeniy's out-of-pocket losses, and therefore compensable. The cash payment warrants further discussion.

Yevgeniy testified that $20,000 of the $28,000 cash he paid to Shvartzman at the closing was for rent and a security deposit. Tr. 47, 168, *but see* Tr. 183 (Yevgeniy answering under cross-examination that he did not think he reimbursed Shvartzman for the security deposit held by the landlord). Shvartzman's testimony confirmed the amount of his deposit for rental of the

property: he testified that he had paid a security deposit of $15,000 plus $5,000 for a "rent deposit" when he first took out the lease. Tr. 192, 224-25. Yefim also testified that he and Yevgeniy paid $20,000 as security and rent after the closing. Tr. 74-76, 154. Yefim testified that they did not get a receipt but that "[Shvartzman] just put his signature." Tr. 154. Although Yefim did not state where Shvartzman signed, I note that another document the plaintiffs introduced in evidence at the inquest, which is in Russian (and which no party sought to have translated into English), includes in one entry the figure of $20,000, followed by Shvartzman's signature. PX 15 (the "Russian Text Document").[9] The February 20 Contract also states that Yevgeniy agreed to reimburse Shvartzman $15,000 for his initial security deposit paid on the execution of the lease, and an additional sum for one month rent in advance. DX A § 2(d). Based on this evidence, I conclude that the plaintiffs have demonstrated to a reasonable certainty that $20,000 of the cash paid to Shvartzman at the closing of the sale of the gas station should be included among their out-of-pocket losses arising from the fraud.

The same is not true with respect to the remaining $8,000 of the cash payment. Yevgeniy and Yefim testified that $8,000 of the $28,000 in cash they paid to Shvartzman at the closing went towards the down payment. Tr. 46-47, 70, 74-76, 168. The Russian Text Document

---

9 The Russian Text Document appears to be a form of receipt for payments made by the Yezerskiys to Shvartzman as part of the purchase of the gas station. Indeed, Shvartzman described the contents of the document by saying, "[t]his is expense was paid by Mr. Yezerskiys." Tr. 235-37. The document lists several sums of money on separate lines, six of which are followed by identical signatures (although the sixth sum and the accompanying signature are crossed out). Shvartzman confirmed those signatures as his own. Tr. 235. Moreover, each of the six dollar amounts listed in the document's line items – $2,000, $23,000, $57,000, $8,000, $20,000, and $10,000 – corresponds to the amount of a payment that Yevgeniy and Yefim described as having been made in the course of the purchase of the gas station. Had it been translated into English, this document might have been more useful in assessing the veracity of the plaintiffs' claims of loss; without a translation, however, I accord it little weight.

includes an entry in the same amount, followed by Shvartzman's signature. PX 15. I therefore conclude that the amount was paid for some purpose relating to the sale of the gas station. The record is less clear, however, as to who made the payment. Yefim testified that he made the payment, not his son Yevgeniy. Tr. 132-33. Yevgeniy's testimony on that score was inconsistent, and, in my view, unreliable. *Compare* Tr. 47 ("I paid .... ") *with* 168 ("We paid …. "). I therefore conclude that the plaintiffs have not met their burden to establish to a reasonable certainty that the $8,000 paid to Shvartzman represents an out-of-pocket loss suffered by any named plaintiff.

          b.      <u>Other Payments</u>

The plaintiffs claim to have incurred several specific losses in addition to those directly related to their purchase of the gas station. In particular, they presented evidence of the following costs, each of which I discuss in turn below:

- $300 that was spent on Beach Channel's corporate registration, Tr. 101;

- a check for $300 that Yevgeniy gave to Herman for the purpose of "checking the debts" of the gas station business, Tr. 65-69; PX 5 (copy of front and back of check);

- two checks for $750, or a total of $1,500, that Yevgeniy paid to attorney Yevgeniy Tsyngauz ("Tsyngauz") for services related to the closing, Tr. 58-64; PX 3 (copy of check);

- a check for $172.50 that Yevgeniy paid to the New York State Department of Tax and Finance for taxes on equipment at the gas station, Tr. 93-94; PX 7 (copy of check);

- $10,000 in cash that Yevgeniy deposited into a bank account controlled by Shvartzman on February 28, 2008, to pay for gas in the tanks at the station, Tr. 77-80, 167-69; PX 14 (carbon copy of bank check to Sunoco listing BCS as "Remitter");

- $6,335 in cash that Yezerskiy paid to the driver of a gasoline truck for a delivery of gasoline after the closing, Tr. 76, 169; and

- $4,345 in cash that Yefim paid to a private investigator on July 23, 2004, Tr. 90-93; PX 9 (copy of retainer agreement).

1. <u>The $300 registration payment</u>. Yefim testified that "we" spent $300 to register Beach Channel as a corporation. Tr. 101. Because Yefim is not a party, his reference to "we" is ambiguous: it fails to establish that the payment was made by a named plaintiff. Moreover, in contrast to the bulk of the claimed losses, the plaintiffs provided no documentary proof to corroborate the testimony about this expense. Even assuming the registration fee to be a compensable out-of-pocket loss, I cannot conclude with any reasonable certainty that any plaintiff actually incurred that cost. I therefore recommend against including it in the court's award.

2. <u>The $300 payment to Herman</u>. Yefim testified that Yevgeniy gave a check for $300 to Herman for the purpose of "checking the debts" of the gas station business. Tr. 65-69. In an effort to corroborate that claim, the plaintiffs introduced a check for $300, dated March 4, 2004, and payable to "Lighthouse Land Services." Tr. 67; PX 5. Yefim further testified that Herman reported that he had checked the debts of the business and there were none. Tr. 66. Although the plaintiffs did not adduce any documentary evidence establishing a connection between "Lighthouse Land Services" and Herman – a gap in the proof that might not exist had Herman complied with his discovery obligations – I am satisfied that the plaintiffs have established to a reasonable certainty that they made the payment and that it is recoverable. *See Vaughn*, 470 F. Supp. 2d at 270 (payments for homeowners insurance and pre-closing termite inspection qualified as "actual losses" that, if incurred, would be recoverable in a fraud action).

3.      The $1,500 payment to attorney Tsyngauz.  The plaintiffs have requested compensation for $1,500 in attorneys' fees that Yevgeniy paid by check to attorney Tsyngauz for his services in representing them at the closing.  *See* Pltf. Mem. at 5-6.  They presented sufficient evidence to establish the payment.  Tr. 58-64; PX 3; PX 11 at 1-2.  That payment is, moreover, a direct out-of-pocket cost arising from the defendants' fraud, and is therefore properly recoverable.  *See Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, 2008 WL 4693246, at *5 (E.D.N.Y. Oct. 17, 2008) (awarding recovery of office and storage rent, as an expense "common to most businesses and ... which would likely not have been incurred had plaintiff not relied on" defendant's fraud).

4.      The $172.50 payment for taxes on gas station equipment.  Yefim testified that, at Shvartzman's request, Yevgeniy paid $172.50 to the New York State Department of Tax and Finance for taxes on equipment at the gas station.  Tr. 93.  They supported that testimony with a copy of the relevant check.  PX 7.  Here again, I am satisfied that the payment was made and is a compensable out-of-pocket loss directly attributable to the defendants' fraud.  *See Healing Power*, 2008 WL 4693246, at *5; *cf. Magnaleasing, Inc. v. Staten Island Mall*, 428 F. Supp. 1039, 1045-46 (S.D.N.Y. 1977) (finding that payments plaintiff made for taxes constituted direct pecuniary loss where fraud involved misrepresentation by landlord's agent about estimated tax cost).[10]

---

[10] In *Lama Holding*, the New York Court of Appeals rejected the plaintiff's attempt to recover the $33 million tax liability it incurred as a result of a fraudulent stock transaction – and in doing so wrote that the out-of-pocket rule precludes recovery of tax payments in a fraud action.  668 N.E.2d at 1372-74.  The court reasoned that the tax liability did "not naturally flow from" the underlying fraud but rather from a change in the tax laws, and including the amount in the plaintiff's award "would put it in a better position than" if it had not proceeded with the stock sale.  *Id.* at 1374.  Here, by contrast, Yevgeniy's payment of taxes on gas station equipment was a

5.  The $10,000 cash payment to Shvartzman for gas in the tanks.  Both Yefim and Yevgeniy testified, in substance, that in conjunction with the closing, they paid for gas in the tanks at the station by depositing $10,000 in cash into a bank account maintained by Shvartzman or BCS, and that the money was then transferred from BCS to Sunoco in the form of a bank check.  Tr. 77-80, 167-69.  Although the testimony on the subject was at times unclear and imprecise, I found it to be credible.  Moreover, the plaintiffs supported the testimony with documentary evidence in the form of a carbon copy of a $10,000 bank check dated February 28, 2004, payable to Sunoco, listing BCS as the "Remitter."  PX 14.  The document included a notation in Russian at the bottom, and Yefim translated the notation, without rebuttal, as follows: "this is for gas personally to Yan [Yakov Shvartzman], to the account."  Tr. 79-80.  The plaintiff also provided further, albeit very limited, support for this component of the claim by pointing to three items in the Russian Text Document, each of which listed an amount of $10,000, although one of the three had Shvartzman's signature next to it but was crossed out, and the others bore no signature.  Although the proof on this item is weak in comparison to other components of the claim, at least some of that weakness is fairly attributable to the defendants' default.  Moreover, the plaintiffs' testimony was reasonable:  it is hardly surprising that the sale of a working gas station would entail the transfer of gas in its tanks, and it is difficult to explain why, if the plaintiffs did *not* make the claimed payment, they would have any reason to be in possession of a copy of a bank check used to remit funds from BCS to Sunoco.  I therefore conclude that the plaintiffs have established this component of damages to a reasonable certainty.

direct consequence of his being fraudulently induced to buy that equipment and was not in any way attributable to a change in the tax laws; moreover, allowing the plaintiffs to recoup the payment merely restores the status quo ante – which is precisely the purpose of an award of damages.

6.      The $6,335 cash payment to the gasoline truck driver.  As with the $10,000 cash payment discussed above, both Yefim and Yevgeniy testified to making an additional cash payment of $6,335 to the driver of a gasoline truck for a delivery of gasoline after the closing.  Tr. 76, 169.  In contrast with the evidence regarding the payment to Shvartzman, however, the evidence on this item is ambiguous, unsupported by any documentary proof, and does not stand unrebutted.  Yefim and Yevgeniy did not provide completely consistent descriptions of the timing, circumstances, and purpose of the payment.  *Compare* Tr. 76 *with* Tr. 169.  Unlike the $10,000 payment, for which the plaintiffs had some evidence in the nature of a receipt (the annotated copy of the bank check to Sunoco), they presented no receipt for the $6,335 payment.  And while the Russian Text Document does include an item with the corresponding amount, the fact that the text remains untranslated renders any inference about its significance, in the absence of other documentary proof, purely speculative.  Finally, Shvartzman's testimony directly contradicted the accounts of Yefim and Yevgeniy on this point.  Tr. 212-13.  Although I am loath to place much stock in any testimony he provided – his demeanor was not credible and he demonstrated an unwillingness to litigate the matter fairly throughout these proceedings – his assertion on this matter is one of the few facts about specific items of damages on which he chose to contradict the plaintiffs.  In short, while I believe it is likely that that the plaintiffs actually did make the payment they claim, I must conclude that they have not met their burden of establishing the matter to a reasonable certainty.  I therefore recommend against including the payment among the compensable losses arising from the fraud.

7.      The $4,345 payment to the investigator.  Yefim testified that he paid $4,345 – using money he borrowed – to have a private investigation firm look into the background of the

gas station after the closing and after becoming aware of the fraud. Tr. 90-93. His testimony establishes that the amount claimed was not paid by a named plaintiff, and was not a compensable "actual pecuniary loss" incurred as a direct result of the fraud. *Vaughn*, 470 F. Supp. 2d at 269-70. I therefore recommend against including the payment among the compensable losses arising from the fraud.

       c.      <u>The Defendants' Proposed Reduction</u>

The defendants argue that any damages the court awards should be reduced by amounts that the plaintiffs promised to pay to the defendants as part of the purchase of the gas station. First, they presented evidence that the plaintiffs undertook to repay them for the rental payments and real estate taxes on the premises, and that the plaintiffs never made these payments. Tr. 211-12; DX L. Second, they introduced a document that they claim was prepared as an inventory of goods on hand at the time the plaintiffs bought the gas station, which the defendants describe in their post-hearing memorandum as a "note in the amount of $19,942.00." Tr. 140-42; Def. Mem. at 4 & DX O (the "Inventory"). Third, they argue that the plaintiffs should be responsible for automatic withdrawals by Sunoco from the defendants' account, to cover $69,794.49 in payments for gasoline. Def. Mem. at 5-6 & DX R.

The defendants' argument is deeply flawed. Even assuming that the defendants have sufficiently established the indebtedness on which they rely, which I do not,[11] the amounts that

---

[11]  The exhibit that the defendants characterize as a promise to pay real estate taxes and rental payments is only partially legible, *see* DX L, and the defendants never questioned the plaintiffs about it at the inquest. As for the Inventory, DX O, I acknowledge that it does list specific dollar amounts for "gas" and "cigaret[t]es" and includes some text in Russian adjacent to Yevgeniy's name (which Yefim testified to have signed on his son's behalf, Tr. 146-47) – all of which might support an inference of indebtedness. However, Yefim testified that the Russian text did not indicate any such promise of payment by Yevgeniy. *Id.* In light of that testimony, and of the

the defendants would have the plaintiffs pay would only add to the losses occasioned by the fraud.  By failing to pay such sums to the defendants, the plaintiffs have not entitled the defendants to an offset; they have instead mitigated their damages.

> d.      Total Losses Established By The Plaintiffs

For the reasons set forth above, I conclude that the plaintiffs have established to a reasonable certainty that they suffered compensable losses totaling $113,972.50, consisting of checks in the respective amounts of $2,000, $23,000, and $57,000 that Yevgeniy paid to purchase the gas station; $20,000 in cash for rent and the security deposit; checks for $300, $1,500, and $172.50, respectively, for expenses directly related to the transaction; and $10,000 in cash for gasoline in the station's tanks.  I therefore respectfully recommend that the court award damages in the amount of $113,972.50.

> 3.      Prejudgment Interest

An award of prejudgment interest on damages for New York common law fraud is mandatory.  *Healing Power*, 2008 WL 4693246, at *9 (citing N.Y. C.P.L.R. § 5001; *Strobl v. New York Mercantile Exch.*, 590 F. Supp. 875, 881 (S.D.N.Y. 1984), *aff'd*, 768 F.2d 22 (2d Cir. 1985)).  While the plaintiffs failed to request prejudgment interest in the Complaint, such failure does not amount to a forfeiture of their right to this interest.  *See Julien J. Studley, Inc. v. Gulf Oil Corp.*, 425 F.2d 947, 949 (2d Cir. 1969).

---

defendants' failure to provide a translation of the Inventory's text, I accord the Inventory little weight.  Moreover, the defendants did not establish that the plaintiffs received any proceeds from sales of the goods and gas at the station; to the contrary, the parties gave conflicting testimony on that score.  *Compare* Tr. 187 (Yevgeniy claiming Shvartzman received all proceeds) *with* Tr. 214 (Shvartzman claiming Yevgeniy and Yefim collected all such proceeds).  While it is the plaintiffs' burden to establish their losses, it is the defendants' burden to establish their right to a set-off, and they have not done so.

Under applicable New York law, the court should award interest at an annual rate of nine percent, for the period from the date the cause of action accrued through the entry of final judgment. N.Y. C.P.L.R. §§ 5001(b), 5004. Where damages are incurred on multiple dates, the court may award interest starting from the various dates on which such damages were incurred, or has discretion to select a reasonable intermediate date on which to begin the accrual of interest on the total damages amount. *Id.* § 5001(b); *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994). The plaintiffs have requested prejudgment interest from March 8, 2004, which they claim is the date Yevgeniy made his last payment to the defendants in the form of the $10,000 cash payment to Shvartzman. Pltf. Mem. at 10. The request is reasonable, particularly given that most of the compensable losses accrued slightly earlier (if not all of them).[12] Applying nine percent annual interest to the recommended damages award of $113,972.50 for the period of six years and 221 days between March 8, 2004, and October 15, 2010 (which I estimate to be the earliest possible date for the entry of judgment, allowing for the 14-day period for objections to this Report and Recommendation) results in a total of $67,755.87 in interest. I respectfully recommend an interest award in that amount.

C.    Count Three:  Punitive Damages

Under New York law, "'there may be a recovery of exemplary damages in fraud and deceit actions where the fraud, aimed at the public generally, is gross and involves high moral culpability.'" *Koufakis v. Carvel,* 425 F.2d 892, 907 (2d Cir. 1970) (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961)). A required showing of egregious tortious conduct must, therefore, be "part of a pattern of similar conduct directed at the public generally." *Newman v. Mor*, 2009

---

[12]  The testimony suggests that the payment was actually made nine days earlier, at the closing on February 28, 2004, not March 8. Tr. 77.

27

WL 890552, at *7 (E.D.N.Y. Mar. 31, 2009). This is because the purpose of punitive damages is "not to remedy private wrongs but to vindicate public rights." *Rocanova v. Equitable Life Assurance Soc'y*, 634 N.E.2d 940, 943 (N.Y. 1994).

The necessary showing has not been made here, because the plaintiffs have not alleged that the defendants were engaged in a larger scheme to defraud the public. While the defendants did advertise the business to the public, that fact proves no more than that the defendants were indifferent to the identity of their victim; it does not prove that the conduct at issue threatened a more widespread harm. Moreover, while an award of punitive damages has been permitted where a complaint alleges that "defrauding the general public into entering ... contracts, such as the one [the plaintiff entered], was the very basis of the defendants' business," *Walker*, 10 N.Y.2d at 403, there is no such allegation here. Rather, the plaintiffs allege only that Shvartzman had engaged in one other fraud. Complaint ¶ 42 (alleging similar deceit in Shvartzman's sale of a car wash). The defendants committed "no more than a private wrong for which no recovery of punitive damages may be had." *Brook Shopping Ctrs., Inc. v. Bass*, 483 N.Y.S.2d 1021, 1022 (App. Div. 1985); *see also E*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 390 (S.D.N.Y. 2009). I therefore respectfully recommend that the court deny the plaintiffs' request for punitive damages and instead dismiss Count Three.

D.     Count Four:  Rescission

Although the plaintiffs have inartfully pleaded their rescission claim, I recommend that the court should grant judgment on it and rescind any contractual obligation among the parties arising from the sale of the gas station.

The plaintiffs assert that they are entitled to rescission "by reason of the Defendants' breach of the terms of their agreement," Complaint ¶ 130, and their demand for relief on this cause of action refers explicitly only to monetary damages rather than to rescission itself. *See id*. ¶ 132. It is nevertheless apparent from the context of the pleading that the plaintiffs believe they are entitled to relief primarily because the defendants defrauded them into entering into a contract (and not simply because the defendants committed a breach after the contract was executed), and that the relief sought in the fourth count is not limited to money damages but includes the equitable remedy of rescission. *See id*. at 20 (using the term "RESCISSION " in the heading for Count Four); *id*. at 23 (requesting "such other and further relief as to this Court may seem just and proper").

"A contract induced by fraud ... is subject to rescission, rendering it unenforceable by the culpable party." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Group, LLC*, 798 N.Y.S.2d 14, 16 (App. Div. 2005). Rescission is an equitable remedy "to be invoked only when there is lacking [a] complete and adequate remedy at law and where the status quo may be substantially restored[.]" *Rudman v. Cowles Commc'ns*, 280 N.E.2d 867, 874 (N.Y. 1972). When a contract is rescinded, its "effect is to declare the contract void from its inception and to ... restore the parties to status quo." *Symphony Space v. Pergola Props.*, 631 N.Y.S.2d 136, 144 (App. Div. 1995) (internal quotation marks omitted).

Traditionally, New York's "election of remedies" doctrine precluded a plaintiff from obtaining both damages from a fraudulently induced contract and rescission of that same contract, since damages affirmed the contract and penalized the fraudulent party for breach while rescission instead vitiated the contract. Thus, courts considered the two remedies inconsistent

and required a plaintiff to elect one or the other.  *See Weigel v. Cook*, 142 N.E. 444, 446 (1923).

The legislature eventually overruled *Weigel*, however, and New York law now provides that,

"[i]n an action for rescission or based upon rescission[,] the aggrieved party shall be allowed to

obtain complete relief in one action, including rescission ... and damages to which he is entitled

because of such fraud."  N.Y. C.P.L.R. § 3002(e); *see also Imaging Int'l v. Hell Graphic Sys.,*

*Inc.*, 816 N.Y.S.2d 696, at *5 (Sup. Ct. 2006) (table); David D. Siegel, New York Practice § 218

(4th ed.) ("[W]here D's fraud induced the contract, entitling P to rescind it but also causing P

monetary injury, which rescission alone would not requite, P may seek (and get) both in one

action.").[13]

       As explained above in the discussion of Count Two, the plaintiffs have established that

Shvartzman and BCS fraudulently induced them into purchasing the gas station.  They are

therefore entitled to complete relief that restores them to the position they would have occupied

in the absence of such fraud.  Awarding the monetary damages achieves that goal in part, but it is

not a complete remedy:  while such an award will compensate the plaintiffs for the consideration

paid to the defendants and their other pecuniary losses sustained as a direct result of the fraud, it

will not remedy the other detriments they suffered as a result of the transaction.  Specifically, it

will not relieve them of any continuing obligations under the contract of sale, the debt Yevgeniy

undertook for $150,000 plus interest under a promissory note signed in conjunction with the

---

[13]  Notwithstanding that statutory change, some decisions in this circuit have continued to apply
the election of remedies doctrine to preclude a plaintiff from obtaining both damages and
rescission.  *See, e.g., Healing Power*, 2008 WL 4693246, at *8 n.7 (citing *Sofi Classic S.A. de
C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 238 (S.D.N.Y.2006) (citing *Morse/Diesel, Inc. v. Fid.
and Dep. Co. of Maryland*, 768 F. Supp. 115, 117 (S.D.N.Y. 1991))).  None of those cases
addresses the revised statute, and none of them can be reconciled with its explicit terms; I
therefore respectfully recommend that the court decline to follow such precedent and instead
apply the statutory law of New York as written.

transaction, the encumbrance of all of the shares of Beach Channel under a collateral pledge agreement,[14] the liability for real estate taxes for four months in 2004 under the handwritten note signed by Yevgeniy, or any debts the defendants purport to ascribe to Yevgeniy under the untranslated terms of the Inventory document. *See* DX F; DX H; DX L; DX O. All of those obligations – to the extent they would otherwise be enforceable – came into being as a direct result of the defendants' fraud, and all of them are therefore subject to the equitable remedy of rescission. *See Rudman*, 280 N.E.2d at 874; *Merrill Lynch*, 798 N.Y.S.2d at 16.

The plaintiffs have not specifically asked the court to cancel the promissory note or the other agreements. Nevertheless that remedy is within the scope of the relief they have requested. *See Spadanuta v. Incorporated Village of Rockville Centre*, 239 N.Y.S.2d 598, 601 (Sup. Ct.

---

[14] The existence of the pledge agreement poses a problem with respect to the enforcement of any judgment in favor of the corporate plaintiff. That agreement secures the promissory note and assigns all of Beach Channel's stock to Herman as escrow agent to hold until either the note is paid in full or there is a default on the note. DX H. The plaintiffs breached their agreement with the defendants after discovering the fraud. *See* DX X (handwritten Russian note which Yefim testified to having written and signed on Yevgeniy's behalf and which he testified was an agreement by his son "to breach the buy/sell agreement" (Tr. 150-51)). Thus, to the extent the plaintiffs defaulted on the note (though I recognize that Shvartzman and BCS arguably breached the agreement first, which would mean that Yevgeniy's disavowal of further performance did not constitute a breach), ownership of Beach Channel passed to the defendants pursuant to the pledge agreement's terms. If that is so, any award to Beach Channel would fall into the hands of the defendants and therefore result in an unintended and unwarranted windfall to them. By contrast, awarding relief only to Yevgeniy carries no risk of unfairness to anyone else, because as the previous owner of Beach Channel, Yevgeniy is the only one with any legitimate ownership claim in the corporation's legal claims on funds misappropriated by the fraud, which serve as the basis for an award by the court. In other words, by awarding damages to plaintiff Yevgeniy alone, and declining to make an award to plaintiff Beach Channel, the court ensures Yevgeniy is made whole, avoids having damages flow to the defendants, and does not risk denying relief to other Beach Channel shareholders since there were none besides Yevgeniy. Moreover, if it is in fact true that Beach Channel has been owned by the defendants since Yevgeniy's "breach," then Yevgeniy and his counsel have never had sufficient authority to prosecute a lawsuit on the company's behalf. As a result, I conclude that the uncertainty over the current status of Beach Channel's ownership counsels in favor of awarding judgment to Yevgeniy alone, and I respectfully recommend that result.

1963) ("While the defendants' pleading does not ask for this form of relief, on a proper showing of facts a recision [sic] can nevertheless be adjudged."), *modified on other grounds*, 248 N.Y.S.2d 405, *aff'd*, 205 N.E.2d 525 (N.Y. 1965). Moreover, these instruments are, in effect, a part of the contract, since

> in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument.

*BWA Corp. v. Alltrans Exp. U.S.A., Inc.*, 493 N.Y.S.2d 1, 3 (App. Div. 1985) (citing *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (1941); *see This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."). The instruments here were all executed by Yezerskiy and Shvartzman to provide consideration for the purchase of the gas station; indeed, the February 20 Contract indicates that the execution of the promissory note, the security agreement, and "other instruments necessary to perfect the Seller's security interest" were all requirements of the transaction. DX A § 2(c). The promissory note and other instruments were all executed on March 4, 2004, at substantially the same time the contract of sale took effect, and plainly as a component of the overall transaction the parties negotiated.

If these agreements were permitted to stand, the plaintiffs would be saddled with debt and other encumbrances and would thus find themselves in a position worse than they were in before being defrauded; moreover, if the plaintiffs discharged their obligations under those agreements, the defendants would reap a windfall. Such a result would be unjust. Granting rescission of the contract and associated agreements, in combination with the award of damages recommended above, will return the parties to the position they were in before the plaintiffs were defrauded by

the defendants and will not lead to a double recovery. I therefore respectfully recommend that the court grant judgment on Count Four and order the rescission of all agreements between the plaintiffs and Shvartzman or BCS, including the contract of sale (regardless of whether the terms of that sale are those set forth in the February 20 Contract or those described by Yevgeniy as having superseded that document), the promissory note, the collateral pledge agreement, the promise to pay real estate taxes, and the obligations purportedly described in the Inventory.

E.      Count Five:  Accounting

The plaintiffs also seek an accounting of "all revenue and income earned by the business" since February 20, 2004.  Complaint ¶¶ 138-43; *id*. at 22 (prayer for relief ¶ F).  An accounting is an equitable form of relief that is available only if a plaintiff can show the following:  (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him the burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal.  *Pressman v. Estate of Steinvorth*, 860 F. Supp. 171, 179 (S.D.N.Y. 1994); *300 Broadway Realty Corp. v. Kommit*, 235 N.Y.S.2d 205, 206 (Sup. Ct. 1962).

I recommend against awarding judgment on this count because it is, in essence, duplicative of other forms of relief I believe the plaintiffs deserve.  As a result of their success in demonstrating the defendants' fraud, I conclude that the plaintiffs are entitled to relief that restores the status quo ante – namely, monetary damages arising from the fraud, and rescission of all fraudulently induced contractual obligations.  If the court grants such relief, the plaintiffs will have no further interest in the gas station and its profits after the date of the rescinded transaction – and therefore no legitimate need for the equitable remedy of an accounting.  *See Miller v.*

*Crown Zellerbach Corp.*, 122 N.Y.S.2d 836, 837 (App. Div. 1953) (denying accounting where "there was no fund or property in the hands of the defendant which belonged, in equity, to the plaintiff"). I therefore respectfully recommend that the court deny the plaintiffs' request for an accounting and instead dismiss Count Five.

F.     Count Six:  Injunctive Relief

In their final cause of action, the plaintiffs seek a preliminary injunction to prevent the defendants from selling the business to any third party pending a determination of this action. As entry of judgment will determine this action, that request is moot. In any event, the court is precluded from considering the merits of this claim, since the plaintiffs lack standing to seek this relief on behalf of third parties. *See Warm*, 422 U.S. at 499-500. I therefore respectfully recommend that the court deny the plaintiffs' request for injunctive relief and instead dismiss Count Six.

G.     Attorneys' Fees

The Complaint does not include a request for attorneys' fees, but the plaintiffs subsequently requested such fees. Pltf. Mem. at 15-18. Specifically, they seek reimbursement of $2,000 they paid to attorney Marvin Kramer ("Kramer"), who initiated the action on their behalf, as well as $57,958 in fees, plus costs and disbursements that Kramer's successor, attorney Val Kleyman, has billed since Kramer's death. *See* Tr. 94-99; PX 12; PX 13; Pltf. Mem. at 15-18. Under New York law, the general rule is that "attorneys' fees and disbursements are incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court rule." *A.G. Ship Maint. Corp. v. Lezak*, 503 N.E.2d 681, 683 (N.Y. 1986).

The plaintiffs argue that they are entitled to the fees based on a provision of the February 20 Contract, which they claim "provides for 'reasonable attorney[s'] fees arising out of the breach of any representation or warranty' in the agreement." Pltf. Mem. at 15 (citing DX A ¶ 9). That argument suffers at least two fatal flaws. First, in making the argument, the plaintiffs rely on a document that they have disavowed as accurately reflecting the terms of the transaction. Tr. 105, 173-76. Second, even if the plaintiffs were willing to concede the accuracy of the February 20 Contract in that regard, they have taken the position (and in my view have established) that the entire agreement is void *ab initio* as a result of the defendants' fraud and should therefore be deemed rescinded. The plaintiffs have not provided evidence of any other agreement providing for attorneys' fees; nor have they identified any New York statute or court rule authorizing them to collect such fees, nor could they, since New York courts generally refuse to award attorneys' fees in actions for common law fraud. *See*, *e.g.*, *Vaughn*, 470 F. Supp. 2d at 269 (citing *Pope v. Saget*, 817 N.Y.S.2d 1, 5 (App. Div. 2006)); *Scala v. Sequor Group, Inc.*, 1995 WL 225625, at *9 (S.D.N.Y. Apr. 14, 1995). I therefore respectfully recommend that the plaintiffs' request for reimbursement for their attorneys' fees be denied.

III.    Recommendation

For the reasons set forth above, I respectfully recommend that the court enter judgment in favor of plaintiff Yevgeniy Yezerskiy alone against defendants Yakov Shvartzman and Beach Channel Services, Inc. on Count Two of the Complaint, and award a total of $181,728.37, consisting of $113,972.50 in compensable losses and $67,755.87 in prejudgment interest; I further respectfully recommend that the court grant the contract rescission requested in Count Four; and I also respectfully recommend that the court deny all of the plaintiffs' remaining

requests for relief (including their claims for attorneys' fees), dismiss Count Two against

defendants Herman and Iorsh, and dismiss Counts Three, Five and Six against all defendants.

IV.     Objections

        I direct the plaintiffs to serve a copy of this Report and Recommendation on each

defendant by certified mail, and to file proof of service no later than October 7, 2010.  Any

objections to this Report and Recommendation must be filed on the electronic docket no later

than October 21, 2010.  Failure to file objections within this period designating the particular

issues to be reviewed waives the right to appeal the district court's order.  *See* 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis,*

*Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

        **SO ORDERED.**

Dated: Brooklyn, New York
       September 29, 2010

                                                    /s/ James Orenstein
                                                    JAMES ORENSTEIN
                                                    U.S. Magistrate Judge